## Kaufman v. The Bryn Mawr Trust Co.

*Jeffrey B. Albert,* for plaintiff.
*Tom P. Monteverde,* for defendants.
*Andrew L. Braunfeld,* for plaintiff.
*Desmond J. McTighe,* for defendants.

STEFAN, *J.,* September 30, 1981—Plaintiff, Richard Kaufman, commenced the within mandamus action on November 23, 1979, to compel defendants, The Bryn Mawr Trust Company (hereinafter bank) and Robert L. Stevens, to produce and deliver a complete, current list of the shareholders of the bank. Defendants have resisted plaintiff's demands for the list, alleging alternatively that: no right to inspect shareholders' lists exists until five days prior to a shareholders' meeting; plaintiff is not entitled to the list because he intends to use it for an improper purpose; and, under applicable Federal Deposit Insurance Corporation regulations, the bank's management may opt to act as a conduit, distributing plaintiff's communications to the shareholders, in lieu of producing the list of shareholders' names and addresses.

The parties appeared before the undersigned on February 20, 21, 27, 28, 29 and March 3, 1980. At the conclusion of the hearings, the court afforded the parties the opportunity to submit proposed findings of fact and memoranda of law. After consideration of the voluminous testimony presented at trial and counsels' briefs, the Chancellor makes the following:

## FINDINGS OF FACT

1. Plaintiff, Richard Kaufman (Kaufman), is an individual, residing at 115 Woods Lane, Radnor, Pa.

2. Defendant, The Bryn Mawr Trust Company (bank) is a bank and trust company, organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Bryn Mawr, Montgomery County, Pa.

3. Defendant, Robert L. Stevens (Stevens), is president of the bank, having assumed that position on January 1, 1980.

4. The bank maintains four branch offices, in addition to its Bryn Mawr location, and advertises itself as a strong, independent local bank offering personal service to its customers.

5. The bank has been operated profitably for a number of years.

6. At all times material to this action, Kaufman owned 5,021 shares of the 205,920 shares of the bank's capital stock outstanding, par value, $5.00 per share.

7. On February 5, 1979, Kaufman, Robert Shay (Shay) and Bruce Fischer (Fischer) filed with the Federal Deposit Insurance Corporation (FDIC) and the bank, an amended form F-11, declaring, as their common purpose, their intent to acquire control of the Bank, to replace all or some of current management, and to explore opportunities to sell to or merge the Bank with another bank.

8. At the commencement of this action, Shay owned 17,392 of the 205,920 shares of the Bank's capital stock outstanding.

9. At the commencement of this action, Fischer owned 2,922 of the 205,920 shares of the bank's capital stock outstanding.

10. On September 10, 1979, the Pennsylvania Department of Banking approved Kaufman's, Shay's and Fischer's combined holdings of 25,332 shares in the bank, but added: "In accordance with the provisions of Section 112 of the Banking Code, should the acquisition of additional shares [in Bryn Mawr Trust Company] be considered by [Shay, Kaufman or Fischer], or anyone acting on their behalf, individually or in concert with others, prior approval of the Department of Banking will be necessary."

11. Morlan International, Inc. (Morlan) is a Pennsylvania corporation engaged, in addition to other enterprises, in the ownership and operation of cemeteries in various states in the United States of America.

12. Morlan's common stock is held by approximately seven hundred public shareholders.

13. At all times material to this action, Shay was president and a controlling shareholder and Kaufman was executive vice-president of Morlan.

14. Forest Hills Cemetery Corporation (Forest Hills) is a wholly owned subsidiary of Morlan.

15. Shay financed his purchase of the bank's stock, in part, with funds borrowed from Forest Hills.

16. Morlan is the general partner of Westminster Cemetery Associates and Shay, Kaufman, Fischer and another individual are the limited partners thereof.

17. Westminster Cemetery Associates wholly owns MII Corporation which, in turn, wholly owns Westminster Cemetery Company.

18. Kaufman and Fischer financed their purchases of the bank's stock, in large part, with money borrowed from Westminster Cemetery Company.

19. Westminster Cemetery Company acquired the funds loaned to Kaufman and Fischer by borrowing from its perpetual care funds.

20. On October 30, 1979, plaintiff delivered a demand for a complete, current list of the bank's shareholders.

21. By letter of November 14, 1979, the Bank declined to honor this request, asserting that no duty to respond existed "unless and until [Kaufman] stated a specific and proper purpose for [his] proposed communication with the shareholders," and reserving to itself, should Kaufman set forth a proper purpose, the right to distribute Kaufman's communication.

22. On November 23, 1979; Kaufman filed this action in mandamus.

23. On January 17, 1980, Kaufman, by his counsel, renewed his request, stating he required the shareholders' list for the following purposes: "(a) to consult with other shareholders in regard to corporate policy and the possibility of new management and/or (b) to possibly solicit proxies."

24. Again, by letter of February 4, 1980, the bank refused to produce the list.

25. On January 31, 1980, Kaufman again submitted his demand, stating he wished to obtain the list to solicit proxies for use at the March 18, 1980, annual shareholders' meeting.

26. By letter of February 15, 1980, the bank rejected this demand, but instead, offered to mail Kaufman's material to the shareholders.

27. On February 22, 1980, Kaufman petitioned this court for a preliminary injunction to delay the Bank's 1980 annual shareholders' meeting, which action was resolved on February 28, 1980, by agreement of the parties, granting Kaufman access to the list of the Bank's shareholders on March 5, 1980. (Agreement entered into by Richard Kaufman, The Bryn Mawr Trust Company, and Robert L. Stevens.)

28. On March 18, 1980, the annual meeting was held.

29. The parties again agreed to allow Kaufman access to the bank's shareholders' list, prior to the 1981 annual meeting.

30. The bank's management fully expressed its reservations about Kaufman, Shay, and Fischer, their past business practices, and their purposes in seeking the shareholders' list in its 1979 and 1980 proxy solicitation materials.

31. Kaufman, Shay and Fischer detailed their opposition to the bank's current management policies in proxy materials mailed to the shareholders prior to the 1980 annual shareholders' meeting.

## DISCUSSION

This dispute pits the firmly entrenched bank management, resolute on maintaining the status quo, against a group of newcomers, equally determined to bring about change. The parties consider access to the list of the bank's shareholders to be the primary·weapon in the struggle. Kaufman contends that, as a shareholder who has asserted a proper purpose, he is entitled to the list. The Bank advances several theories by which it justifies its refusal to honor Kaufman's request.

Initially, the Bank argues the Pennsylvania Banking Code limits its duty to supply the list to produc-

tion at least five days prior to a shareholders' meeting. The Banking Code, Act of November 30, 1965, P.L. 847, No. 356, §101; 7 P.S. §101 et seq., imposes the duty in this manner:

"§1218. Voting lists

(a) The officer or agent having charge of the transfer books for shares of an institution shall at least five days before each meeting of shareholders make a list of the shareholders entitled to vote at the meeting, arranged in alphabetical order with the address of and number of shares held by each shareholder. Such list shall be available for inspection by any shareholder for any proper purpose:

(i) At the principal place of business of the institution at any time during normal business hours, and

(ii) At the time and place of the meeting during the whole time of the meeting.

(b) The original share ledger or transfer book, or a duplicate thereof kept in this Commonwealth, shall be prima facie evidence of the shareholders entitled to examine such list or the share ledger or transfer book or to vote at any meeting of shareholders."

This provision is not exclusive, nor has it abridged the common law right to inspect records at times unrelated to shareholders' meetings.

In Alcorn v. Iron & Glass Dollar Savings Bank, 102 P.L.J. 259 (Allegheny County, 1954), plaintiff-shareholder made numerous demands to inspect defendant-bank's stock transfer books and shareholders' lists, and to extract materials therefrom. The bank responded with outright refusals on some occasions and with permission to inspect, but not to copy, on others. The court stated:

"It is clear that at the common law a stockholder, or his agent, generally has the right not only to in-

spect the corporate books at a reasonable time for a definite, specific and proper purpose but also to make extracts of what he has found [citations omitted]. No exception is made when the corporation happens to be a bank." [Citations omitted]. Id. at 260.

In response to the bank's contention that it was under no duty to allow plaintiff to copy from the records, since no such duty appears in the Banking Code, the court declared:

"While the Act contains no express provision conferring upon shareholders the right of making extracts of material contained in the corporate books, the absence of such grant, in our opinion does not constitute a denial of the right. It has long been the rule that common law rights of shareholders are not limited by constitutional or statutory provisions which only partially codify their common law rights. Such a provision is to be construed, in the absence of express prohibition, as not restrictive of common law rights but rather an amplification thereof." [Citations omitted]. Id. at 261.

In Perlberg v. Union Bank and Trust Company, 335 Pa. 35, 6 A.2d 563 (1939), the assets of one bank were sold to a second bank. The acquiring bank agreed to pay the first bank's creditors and to make a distribution to its shareholders after liquidation of its assets; however, no surplus remained for distribution to the first bank's shareholders. Plaintiff, one of these unpaid shareholders, sought to compel inspection of the second bank's records in order to determine if there had been mismanagement in the conversion of the first bank's assets. In this context, the Supreme Court stated the general principle that: "A shareholders' right to examine in person or by agent or attorney, at reasonable times for reasonable purposes, corporate books and

records and to enforce that right by mandamus, is unquestioned." [Citations omitted]. Id. at 39, 6 A.2d at 565.

Although the court affirmed the second bank's refusal to produce its records, the basis of its holding was the fact that plaintiff owned no shares of that bank's stock.

In the instant action, defendants cite Commercial Banking Corporation v. Freeman, 353 Pa. 563, 46 A.2d 233 (1946), for the proposition that Section 1218 of the Banking Code, supra, defines a shareholder's sole right to inspect a bank's shareholders' list. Defendants point to the court's statement that "the Banking Code is a complete codification of the laws regulating the business of banking in this State." Id. at 567, 46 A.2d at 235. However, the context in which that statement was made differs greatly from the facts at hand.

In Commercial Banking, supra plaintiff was a Delaware corporation, registered in Pennsylvania to buy and sell motor vehicles, and "to render assistance and accommodation, monetary or otherwise, to person or persons engaged in the business of buying, selling and dealing in motor vehicles." Id. at 565, 46 A.2d at 235. Plaintiff also was selling commercial money orders, an activity enjoined when the Secretary of Banking obtained a cease and desist order. Plaintiff sought an injunction against the enforcement of the order. The Supreme Court held that the cease and desist order was proper, construing the Banking Code's provision which restricted "the business of receiving money for deposit or transmission" to banks, bank and trust companies, and savings banks. See, 7 P.S. §105. In its discussion, the court noted:

"In enacting this statute [the Banking Code], it clearly appears that the fundamental intention of

the legislature was to control the business of handling the moneys of others, and to restrict those persons who may engage in such, to the end that unscrupulous or irresponsible persons may not obtain possession of the moneys of the general public and such moneys be lost." Id. at 567, 46 A.2d at 235.

Although the Banking Code delimits the functions of The Bryn Mawr Trust Company as a bank, that statute does not constitute a complete codification of the rights and duties of defendant's shareholders and directors. Whether and under what circumstances a shareholder may obtain a shareholders' list is not a question which relates directly to the "business of banking." To resolve that issue, specific provisions of the Banking Code, dealing with shareholder rights, must be read in pari materia with the more general rights and duties of shareholders and directors, set out in the Pennsylvania Business Corporation Law, Act of July 20, 1968, P.L. 459, No. 216, §1; 15 P.S. §1001 et seq. See, Statutory Construction Act, Act of December 6, 1972, P.L. 1339, No. 290, §3, imd. effective; 1 Pa.C.S.A. §§1932 and 1933.

Sections of the Banking Code which confer specific rights upon bank shareholders merely amplify rights held by all corporate shareholders at common law or under the Business Corporation Law, supra. For example, the Banking Code provides that special meetings may be called by those shareholders who hold at least one-fifth of all votes entitled to be cast. 7 P.S. §1209(c). The Banking Code also authorizes the holder or holders of at least ten percent of the shares of the bank to file suit to remove an officer who has committed fraud or abused his authority. 7 P.S. §1408(c). These sections in no way conflict with the general provisions of the Business Corporation Law, infra, detailing shareholder rights

to inspection and copying of corporate records. Moreover, such rights under the Banking Code would be nugatory to the holder of a small number of shares of bank stock if he had no access to a list of shareholders and, thus, no means of gathering the required number of votes to enforce those rights. Thus, the provisions of the Pennsylvania Banking Code do not restrict plaintiff's right to inspect a shareholders' list to a period of five days prior to an annual meeting.

The statutory right of a shareholder to inspect the books of his corporation is merely a codification of pre-existing common law. See, Goldman v. Trans-United Industries, Inc., 404 Pa. 288, 171 A.2d 788 (1961); Hagy v. Premier Manufacturing Corporation, 404 Pa. 330, 172 A.2d 283 (1961). The Pennsylvania Business Corporation Law, supra, provides:

"§1308 Corporate records; inspection A. Every business corporation . . . shall keep at its registered office or principal place of business . . . an original or duplicate share register, giving the names of the shareholders, their respective addresses and the number and classes of shares held by each. . . .

B. Every shareholder shall, upon written demand under oath stating the purpose thereof, have a right to examine in person or by agent or attorney, during the usual hours for business for any proper purpose, the share register . . . and make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a shareholder. . . .

C. If the corporation, or an officer or agent thereof, refuses to permit an inspection sought by a shareholder . . . the shareholder may apply to the court of common pleas of the county in which the registered office of the corporation is located for an

order to compel such inspection. . . . Where the shareholder seeks to inspect the share register or list of shareholders . . . the burden of proof shall be upon the corporation to establish that the inspection he seeks is for an improper purpose. . . ."

The bank concedes that a proper purpose is presumed when a shareholder requests inspection of the shareholders' list, so that the burden of proving the contrary rests upon the corporation. See, Hauser v. York Water Co., 278 Pa. 387, 123 A. 330 (1924). The bank presents, as evidence of Kaufman's "improper purpose," both alleged past and probable future violations of various federal and state laws. In particular, the bank contends that Kaufman, with Shay and Fischer, violated Section 112(b) of the Banking Code, which states:

". . . it shall be unlawful, without the prior written approval of the department . . . for any person to acquire . . . shares of an institution if the aggregate number of shares held after such acquisition would total more than ten percent of the outstanding shares of such institution. . . ."

By its ruling of September 10, 1979, the Department of Banking approved the group's holdings in the bank. Defendants' suspicions that plaintiff has acquired additional stock since that time have not been proved. Such accusations cannot sustain defendants' burden of proving plaintiff's "improper purpose." Apart from the speculative nature of the bank's fear of future violations of Section 112(b), the code itself provides penalties if such violations do occur. See, 12 P.S. §2105(a) and (b).

The bank asserts Kaufman will use the list to effect purchases of stock from other shareholders, without disclosing material information to them, in violation of Pennsylvania (7 P.S. §112(g)) and federal securities statutes (15 U.S.C. §77j(b)). In par-

ticular, the bank fears Kaufman will conceal prior business practices of the Morlan network of corporations, including inter alia, the fact that perpetual care funds were used to finance some of the group's current holdings. Predictions of future failures to disclose are pure speculation. The bank has informed its shareholders of such dealings in its 1979 and 1980 proxy solicitation materials and can continue to do so in the future. If and when violations do occur, it will be for the cognizant administrative agencies to take the appropriate action.

The bank also argues Kaufman will use the shareholders' list to engage in unregulated proxy solicitation, in contravention of FDIC regulations. 12 C.F.R. §335.5(f)(h). This argument, likewise, fails to prove Kaufman desires the list for an improper purpose. Unsubstantiated allegations of anticipated statutory and regulatory violations are insufficient. While future demands for such lists may be resisted if Kaufman uses this information as defendants anticipate, Kaufman's alleged improper purposes in seeking the lists in this action have not been proved.

Finally, the bank attempts to justify its refusal to grant Kaufman access to the shareholders' list by offering to distribute his materials for him, as provided in the FDIC regulations. Section 335(g) of Title 15 of the Code of Federal Regulations provides:

Mailing communications for security holders. If the management of the bank has made or intends to make any proxy solicitations . . . the bank shall perform such of the following acts as may be requested in writing with respect to the same subject matter or meeting by any security holder who is entitled to vote on such matter or to vote at such meeting and who shall first defray the reasonable expenses to be incurred by the bank. . . .

(2)(i). Copies of any proxy statement form of proxy, or other communication furnished by the security holder shall be mailed by the bank to such holders of records. . . .

(ii) Any such material . . . furnished by the security holder shall be mailed with reasonable promptness by the bank after receipt. . . .

(3) In lieu of performing the acts specified above, the bank may, at its option, furnish promptly to such security holder a reasonably current list of the names and addresses of such of the holders of record. . . . The foregoing information shall be furnished promptly upon the request of the security holder or at daily or other reasonable intervals as it becomes available to the management of the bank.

The bank claims the procedure of supplying the actual list, detailed in subsection (3) above, is an option management can and did refuse to exercise. A plain reading of this regulation indicates that such choice of options applies only "if the management of the bank has made or intends to make any proxy solicitations. . . ." The federal provision, allowing bank management to act as conduit for a shareholder's proxy solicitations to other shareholders under specific circumstances, does not limit plaintiff's right to obtain the list for the purposes described in the instant action. As with the specific shareholder rights conferred by the Pennsylvania Banking Code, discussed infra, such federal regulations amplify management rights in specialized situations. Those options are in addition to general rights existing under our Business Corporation Law. The exercise of such an option is limited to those circumstances described in the specific regulation.

In a case involving a parallel Securities and Exchange Commission regulation, the New York Supreme Court stated:

The fact that Crane may communicate with Westinghouse's stockholders by letter to be mailed by Westinghouse under applicable [SEC] regulations also does not preclude the grant of the relief herein requested [access to the shareholders' list], for the comparative lack of effectiveness of such a manner of solicitation, is obvious and has been recognized by the courts. Crane Co. v. Westinghouse Air Brake Co., 56 Misc. 2d 538, 539, 288 N.Y.S. 2d 984, 986 (1968).

See, also, Application of Ditisheim, 96 N.Y.S. 2d 622 (1950).

As defendants have failed to demonstrate that plaintiff is not entitled to a complete, current list of the shareholders of The Bryn Mawr Trust Company, the chancellor enters the following.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the cause.

2. Plaintiff, a shareholder, has properly made the required demands of defendant for the information sought.

3. The purpose for which plaintiff seeks the information contained in the shareholders' list is a proper one.

4. Defendants have failed to meet the burden of proof by showing that plaintiff acted with an improper purpose.

5. The demand for inspection being properly made, defendant Bank and/or its transfer agent must permit the inspection requested.

6. Plaintiff has no other remedy at law.

7. Each party shall bear his/its costs of the proceedings.

## DECREE NISI

And now, this September 30, 1981, after trial and consideration of memoranda of law submitted by counsel, judgment hereby is entered for plaintiff and against defendants. Defendants are commanded, immediately upon the entry of this decree and upon payment by plaintiff to defendant Bank of its reasonable cost, to furnish and deliver to plaintiff, Richard Kaufman, c/o Jeffrey B. Albert, Esq., Fox, Rothschild, O'Brien & Frankel, 2000 Market Street, Philadelphia, Pa. 19103, the following:

(1) a list of names and addresses of all shareholders of The Bryn Mawr Trust Company as of the date of this decree, with the number of shares held by each; and

(2) from the date of this decree to the record date of voting at the next annual or special meeting of the shareholders of The Bryn Mawr Trust Company, a copy of each daily transfer sheet showing the transfer of record ownership of shares of said bank and trust company.

This decree shall become final unless exceptions are filed pursuant to Pa.R.C.P. 1518.